UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

SCOTT LEWIS RICKNER, # 241348,   )
    )
          Plaintiff,   )    Case No. 1:08-cv-139
    )
v.   )    Honorable Paul L. Maloney
    )
CRAIG HUTCHINSON, et al.,   )    **REPORT AND RECOMMENDATION**
    )
          Defendants.   )
_____)

     This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.

Plaintiff is an inmate at the West Shoreline Correctional Facility (MTF). (docket # 132). His

complaint, as amended, concerns the adequacy of the medical care he received for his hepatitis C at

MTF between August 2006 through March 24, 2008. The defendants are:

    1.     Craig Hutchinson, M.D.;

    2.     William Nelson, M.D.;

    3.     Thomas LaNore, P.A.;

    4.     James Barber, R.N.;

    5.     Karen Boeve, R.N.;

    6.     Shawn Griffin, R.N.;

    7.     Helen Thompson, Health Unit Manager (HUM) and R.N.; and

    8.     Judy Irish, R.N.

Plaintiff sues defendants in their individual and official capacities and seeks an award of monetary damages.

Plaintiff filed this lawsuit on February 8, 2008, and he has never achieved service of process on defendant Judy Irish. The court's May 1, 2009 order expressly notified plaintiff of the impending dismissal of all his claims against Judy Irish without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure for failure to achieve service. (5/1/09 Order, docket # 118). Plaintiff has not attempted to show good cause for his failure to achieve service of process on Nurse Irish. Accordingly, I recommend that all plaintiff's claims against Judy Irish be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure.

The matter is before the court on motions for summary judgment by all defendants except Judy Irish. (docket #'s 50, 91). On August 12, 2008, defendants Barber, Boeve, Griffin, and Thompson filed their motion for summary judgment. (docket # 50). Plaintiff requested and received an extension of time within which to file his response. (8/21/08 Order, docket # 66). On September 29, 2008, plaintiff filed his brief and exhibits in opposition to defendants' motion. (docket #'s 68, 69). On October 13, 2008, defendants filed a reply brief (docket # 74), and on November 3, 2008, plaintiff filed a sur-reply brief (docket # 84). For the reasons set forth herein, I recommend that defendants' motion for summary judgment be granted, and that an order implementing this recommendation be entered. I further recommend that a separate and final judgment be entered in favor of defendants Barber, Boeve, Griffin, and Thompson.

On December 4, 2008, defendants Hutchinson, Nelson, and LaNore filed a Rule 12(b)(6) motion to dismiss plaintiff's claims on the basis of the affirmative defense of lack of exhaustion of administrative remedies as required by 42 U.S.C. § 1997e(a). (docket # 91). Plaintiff

filed his response on January 15, 2009. (docket # 104). The court determined that defendants' motion relied on exhibits outside of the pleadings, and on May 1, 2009, entered an order under Rule 12(d) converting defendants' motion into a motion for summary judgment and limiting the court's consideration to whether defendants Hutchinson, Nelson, and LaNore are entitled to summary judgment based on plaintiff's failure to properly exhaust his administrative remedies. (5/1/09 Order, docket # 118). The parties submitted affidavits and other materials (docket #'s 119-23) as authorized by the court's order. Defendants' motion is ready for decision. For the reasons stated herein, I recommend that the motion for summary judgment by defendants Hutchinson, Nelson and LaNore (docket # 91) be granted, that all plaintiff's claims against these defendants be dismissed without prejudice under 42 U.S.C. § 1997e(a), and that the order implementing these recommendations include an injunction against plaintiff requiring that any lawsuit he subsequently files in this court naming Hutchinson, Nelson, or LaNore as a defendant must include an express reference to this case and its case number.

## Applicable Standards

### A.     Summary Judgment Standards

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Synbrandt v. Home Depot U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d

573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986));

*see Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The court must consider all

pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor

of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

When the party without the burden of proof seeks summary judgment, that party bears

the initial burden of pointing out to the district court an absence of evidence to support the

nonmoving party's case, but need not support its motion with affidavits or other materials "negating"

the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir.

2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows

that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party

has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the

mere allegations of his pleadings. Fed. R. Civ. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th

Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence

sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which

a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555

F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Reed v. International Union,

United Aerospace & Agric. Implement Workers of Am.*, 569 F.3d 576, 579 (6th Cir. 2009).

Where, however, a moving party with the burden of proof seeks summary judgment,

he faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel*

-4-

*v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party

without the burden of proof needs only show that the opponent cannot sustain his burden at trial.

"But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on

an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier

of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259

(6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining

Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of

Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces

"a substantially higher hurdle" and "'must show that the record contains evidence satisfying the

burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to

disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S

FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056 (same).

Accordingly, a summary judgment in favor of the party with the burden of persuasion "is

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier

of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). This higher standard applies to the motion

for summary judgment by defendants Hutchinson, Nelson, and LaNore because lack of exhaustion

under 42 U.S.C. § 1997e(a) is an affirmative defense.

### B.     Standards Applicable to the Affirmative Defense of Failure to Exhaust Remedies

Defendants Hutchinson, Nelson, and LaNore have asserted the affirmative defense

of plaintiff's failure to exhaust administrative remedies and they seek dismissal of plaintiff's claims

on that basis. A prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983

must exhaust available administrative remedies. 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 220 (2007); *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 734. In *Jones v. Bock*, the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. The burden is on defendants to show that plaintiff failed to properly exhaust his administrative remedies. The Supreme Court reiterated that "no unexhausted claim may be considered." 549 U.S. at 220. The Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims. 549 U.S. at 219-24. Claims that are not fairly presented through the grievance process remain unexhausted.[1]

Further, in order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *See Jones v. Bock*, 549 U.S. at 218-19. In *Woodford v. Ngo*, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. Thus, when a prisoner's grievance is rejected by the prison as

---

[1]"Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a full and fair opportunity to adjudicate their claims." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

untimely because it was not filed within the prescribed period, the prisoner's claim is not "properly exhausted" for purposes of filing a § 1983 action in federal court. *Id.* at 90-93; *see* 42 U.S.C. § 1997e(a).

Multiple  versions of MDOC Policy Directive 03.02.130 were in effect during the relevant time period.  Nevertheless, all versions of the policy directive in effect since April of 2003 have required that the prisoner name within the body of his grievance the person whose conduct is challenged.  In *Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009), the Sixth Circuit held that this policy directive "explicitly required [the prisoner] to name each person against whom he grieved," and it affirmed the district court's dismissal of a prisoner's claim for failure to properly exhaust his available administrative remedies.  *Id.* at 470.

Policy Directive 03.02.130 is not limited to the requirement that the individual being grieved be named in the prisoner's grievance.  The following is an overview of the grievance process.[2]  Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P.  If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.  *Id.*  The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent.  *Id.* at ¶¶ W, X.  Prisoners are required to use  "a Prisoner/Parolee Grievance (CSJ 247A) [form] to file a Step I grievance."  *Id.* at ¶ R.  If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form

---

[2]The paragraph references in this section correspond to the current version of Policy Directive 03.02.130.  (*See* docket #119, Ex. A, Attachment 2).

within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Regional Health Administrator is the Step II respondent for a grievance regarding health care issues. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. The Grievance and Appeals Section forwards grievances regarding health care issues to the Administrator of the Bureau of Health Care Services (BHCS). "The BHCS Administrator shall ensure that the grievance is investigated and a response provided to the Grievance and Appeals Section in a timely manner. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing ...." *Id.*

Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process. An argument that it would have been futile to file a grievance does not suffice. Assertions of futility do not excuse plaintiff from the exhaustion requirement. *See Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir.1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations."); *see also Booth v. Churner*, 532 U.S. at 741 n. 6 ("[W]e will not read futility or other exceptions into

statutory exhaustion requirements where Congress has provided otherwise."); *Jones v. Douglas*, 108 F. App'x 254, 256 (6th Cir. 2004).

**Proposed Findings of Fact**

The following facts are beyond genuine issue. Plaintiff was an inmate at the West Shoreline Correctional Facility (MTF) from August 2006 through March 24, 2008. In August of 2006, plaintiff was contacted by a former needle sharing partner who had been diagnosed with hepatitis C. Plaintiff was advised to request testing. (docket # 61 at 1). On August 8, 2006, a blood sample was taken. On August 22, 2006, plaintiff sent a kite requesting the test results. Nurse Boeve responded that plaintiff would be informed when the test results were available. On September 25, 2006, plaintiff's blood test returned positive results for hepatitis C antibodies.

**A.    Hepatitis C Treatment Protocol**

The MDOC's diagnostic and treatment protocol for prisoners with hepatitis C, also known as the Hepatitis C (HCV) Clinical Management Program, consists of five phases:

(1)    Education;

(2)    Screening and initial diagnosis;

(3)    Initial management after diagnosis;

(4)    Pretreatment workup and liver biopsy; and

(5)    Hepatitis C combination therapy.

(docket # 51, Ex. A and Attachments A- through A-9). In Phase 1, prisoners are educated regarding the dangers of blood-borne pathogens. Phase 2 includes a comprehensive panel of blood tests.

Prisoners who test positive for hepatitis C are provided with counseling and are enrolled in the Viral Hepatitis C Chronic Care Clinic. (docket # 1, Ex. 3).

In Phase 3, comprehensive test panels are drawn at 2, 4, and 6 months after the prisoner's enrolment in the Clinic. Prisoners whose liver enzymes[3] are higher than normal but less than twice the normal level are monitored with chemistry panels and Clinic visits at least every six months. Prisoners whose liver enzymes are elevated an average of two times the upper limit of normal over the preceding six months are offered further evaluation, and if they agree, these additional tests are ordered: TSH; ANA; prothrombin time; serum protein electro-phoresis; fasting serum iron and iron binding capacity; HIVAb; and HBsAg. After these tests are completed, the primary care provider completes a "Chronic Hepatitis C Treatment Evaluation Worksheet" and sends it to the managed care provider requesting an infectious disease consultation. "Prisoners who are being referred for infectious disease consultation are counseled on workup, treatment options, treatment side-effects, and are required to sign a Hepatitis C Biopsy and Treatment Contract." (docket # 1, Ex. 3, docket # 51, Ex. A-2). Some of the known side-effects of combination therapy with Interferon and Ribavirin include the following: "injection site inflammation; flu-like symptoms (headache, chills, fatigue, fever); gastrointestinal symptoms (loss of appetite, nausea, vomiting, diarrhea, heartburn or indigestion); psychiatric symptoms (depression, insomnia, anxiety, irritability); respiratory (shortness of breath, cough); skin disorders (hair loss, rash, itching, dry skin) and blood element problems (reduction in the number of white blood cells, reduction of platelets, and anemia)." *Id.*

---

[3]The specific enzymes being measured are alanine transaminase (ALT) and aspartate transaminase (AST).

Phase 4 of the protocol consists of a pretreatment work-up and liver biopsy. (docket # 1, Ex. 3; docket # 51, Ex. A, Attachment A-2). During this evaluation process, the possible contraindications to effective therapy are assessed, because "the intent is to enable medically eligible patients to complete a course of monitored therapy, if tolerated." (docket # 51, Ex. A, Attachment A-2). "Exclusion Criteria for Combination Therapy" includes prisoners who are too sick with other ailments (such as cancer or renal insufficiency) to withstand the therapy, prisoners who are not sufficiently ill with consistently high liver enzyme levels to warrant this form of treatment with its known significant side-effects, prisoners who already have a history of uncontrolled psychiatric or psychological conditions, and prisoners who continue to abuse alcohol or other substances that would seriously undermine therapy's effectiveness. (*Id.*, Attachment A-9). Hepatitis C patients are generally instructed to make minimal use of all pain medications. They should especially avoid narcotics. "Aspirin and Ibuprofen (Motrin, Advil)" are to be used with extreme caution, and only after the prisoner discusses it with a physician. "Acetaminophen (Tylenol)," should not be used in excess of four grams per day and chronic use should be avoided. (*Id.*, Attachment A-3). Further, Phase 4 includes finding the prisoner's virus genotype. Genotype testing is performed before consideration of a liver biopsy because it impacts the length of the treatment regimen and eligibility for receiving combination therapy. (*Id.*, Attachment A-2; docket # 1, Ex. 3).

Phase 5 of the treatment protocol is hepatitis C combination therapy with Interferon and Ribavirin. Prisoners undergoing therapy receive regular medical care including psychological evaluations. The treatment period for prisoners with hepatitis genotypes 1 and 4 is 48 weeks. (docket # 51, Ex. A, Attachment A-5).

## B. Medical Care

On September 27, 2006, plaintiff received his post-test counseling and was enrolled in the Viral Hepatitis C Chronic Care Clinic. (docket # 104, Ex. 2 at 2; docket # 61 at 336; docket # 11, Ex. 2). Later the same day, plaintiff filed a health care request asking for an immediate liver biopsy and treatment. The response to this health care request advised plaintiff that he had been instructed on the MDOC's treatment protocol for prisoners with hepatitis C, and that he had received health care services earlier that day. (docket # 11, Ex. 2). It is indisputable that plaintiff's request was improper. It was an attempt to bypass the months of testing in Phase 3 and the pre-biopsy portions of Phase 4, and proceed directly to a surgical biopsy followed by treatment with Interferon and Ribavirin. On September 27, 2006, plaintiff filed Grievance Number MTF-06-09-708-12D against CMS.[4] On October 10, 2006, plaintiff wrote a letter to defendant Thompson claiming that he was being "refused" a liver biopsy and "denied" hepatitis C treatment. (docket # 11, Ex. 1). Four days later, he sent a health care request to Nurse Thompson demanding to know why he was being denied a biopsy and treatment. (docket # 11, Ex. 4). Thompson responded that plaintiff was scheduled for a medical examination on October 17, 2006. (*Id.*). Plaintiff filed other health care requests on October 4, 6, 11 and he received responses on October 5, 8 and 13, 2006. (docket # 1, Ex. 5).

Plaintiff's comprehensive panel of tests on October 12, 2006, generally returned normal results. (docket # 11, Ex. 3). His ALT and AST enzyme levels were elevated. (*Id.*). Pre-treatment tests on November 16, 2006, revealed that plaintiff's hemoglobin was 16.3 and his white

---

[4]Plaintiff's grievances and grievance appeals are examined in detail in the next section of the report and recommendation.

blood cell count (WBC) was 5.32. (docket # 61 at 339). Treatment with Interferon and Ribavirin generally reduces a patient's hemoglobin and white blood cell count. Plaintiff's medical history included significant alcohol abuse. Because there is no medical evidence that patients with decompensated cirrhosis benefit from Interferon and Ribavirin treatment, additional tests were performed to rule out that condition. Tests performed on January 11, 2007, ruled out HIV infection and other medical conditions incompatible with combination therapy. (*Id.*). During this testing period, plaintiff sent a number health care requests demanding a liver biopsy and immediate treatment. (docket # 11, Ex. 4). Plaintiff received responses to these inquiries. (Boeve Aff. ¶¶ 4-5, docket # 51). On March 6, 2007, plaintiff sent a health care requests inquiring when he would have his liver biopsy. Nurse Barber responded, "I see no approval yet. As you know, it takes time." (docket # 11, Ex. 4). On May 17, 2007, plaintiff submitted a kite inquiring whether prison health care services had received word from CMS on whether plaintiff had been approved for a liver biopsy. Nurse Boeve responded that as far as she knew the request for biopsy approval had been submitted. (docket # 11, Ex. 4; Boeve Aff. ¶ 7). On June 26, 2007, plaintiff sent a health care request asking whether his liver biopsy had been approved. He received a response later that day indicating that the biopsy had not yet been approved. (docket # 69, Ex. B).

In July 2007, plaintiff's hepatitis C was determined to be of "genotype 1a." On August 8, 2007, Physician's Assistant LaNore filed a consultation request asking that plaintiff be scheduled for a liver biopsy. On August 16, 2007, Dr. Hutchinson authorized the liver biopsy. He further advised that before the surgical procedure was performed, plaintiff should be advised of this procedure's risks and purpose. (docket # 1, Ex. 7; docket # 11, Ex. 5). On August 31, 2007, plaintiff signed a Hepatitis C Biopsy and Treatment Contract. (docket # 61 at 429). This document advised

plaintiff that hepatitis C treatment was reserved to patients who understand the commitment to therapy, will tolerate and comply with the course of treatment, and who agree to avoid activities which may worsen their liver disease or spread it to others. Plaintiff agreed to comply with these requirements. (*Id.*). Plaintiff's surgery was scheduled for September 11, 2007. (docket # 11, Ex. 5).

On September 11, 2007, plaintiff underwent an ultrasound of the liver and guided needle liver biopsy. (docket # 51, Ex. A). Dr. Reichardt interpreted the biopsy results. He found that plaintiff had a "mild-moderately active (grade 2-3) chronic hepatitis C with protal/periportal (stage 2) fibrosis." (docket # 1, Ex. 7; docket # 11, Ex. 5).

On November 8, 2007, P.A. LaNore submitted a consultation request asking for an infectious disease specialist to evaluate plaintiff's hepatitis C. (docket # 61 at 150-55). His examination of plaintiff on the same day returned normal results. Plaintiff stated that he experienced some fatigue, but no other symptoms. (*Id.* at 151-55). On December 5, 2007, plaintiff submitted a health care kite regarding when he would be approved for treatment of his hepatitis C. Nurse Griffin responded that plaintiff had an upcoming appointment with a specialist to determine his treatment options. (*Id.* at 145; Griffin Aff. ¶ 3).

On December 15, 2007, plaintiff submitted a kite complaining that his parents had recently told him that a person with liver problems should not use Motrin. Later that day, plaintiff received a response from a non-defendant nurse advising him that he should discuss the matter with the doctor at his upcoming appointment and that the physician could explain the "risks v. benefits." (docket # 61 at 144). Two days later, plaintiff filed a kite arguing that he should be assigned a bottom bunk because he was scheduled to begin treatment for his hepatitis C. Plaintiff was observed

to walk, stand up and sit down without difficulty and there was no indication of a medical need for a bottom bunk assignment. Nurse Griffin advised plaintiff that he did not then meet the requirements for a bottom bunk assignment, and plaintiff's request was denied. Plaintiff was advised to discuss the bottom bunk assignment with Dr. Hutchinson at his upcoming appointment. (*Id.* at 141-42).

On December 20, 2007, Craig Hutchinson, M.D., an infectious disease specialist, performed a consultation evaluating plaintiff's candidacy for antiviral treatment of his Hepatitis C infection under the MDOC's protocol. (docket # 61 at 137-39; docket # 69, Ex. A, Attachment). The phase 4 "decision whether to offer combination therapy is made based on the degree of fibrosis, degree of inflamation and the suspected length of time infected and is individualized. Generally, inmate-patients whose liver biopsy shows a grade 3 or 4 inflammation and any degree of fibrosis and do not have advanced decompensated cirrhosis or other contraindications to antiviral therapy will be considered for antiviral therapy." (docket # 51, Ex. A, Attachment A-2). Plaintiff gave a medical history which included sharing needles and cocaine use in 2002. He stated that in the 1980s he used intranasal cocaine with a shared straw. His medical history included heavy alcohol abuse. Plaintiff stated that he quit drinking in 2004, about a year before he began his incarceration. He reported receiving prison tattoos during his incarceration. (docket # 61 at 137). His medications included occasional Motrin use related to right knee pain from an old motorcycle accident injury. (*Id.*). He had a history of depression. (*Id.* at 138). Plaintiff's blood pressure was 137/70. Dr. Hutchinson observed that plaintiff's liver biopsy report did not contain any comment suggesting a problem with extra iron and plaintiff's ultrasound showed a normal gallbladder and heptobiliary system. (*Id.* at 137). Dr. Hutchinson made the following recommendations:

1.    He should receive Pneumovax.  I would consider, and I would support, giving him a bottom bunk due to knee arthritis; especially if this is confirmed on radiographs.

2.    For the next week he should have a CBH, TSH, comp panel and PT/INR.

3.    If there are no unexpected results from laboratory work he is cleared for Pegasys 180 mcg SC per week plus Ribavirin[5] 600 mg PO BID restricted for the morning dose plus acetaminophen 650 mg PO TID for three doses after each Pegasys dose.  Plan on 48 weeks of treatment subject to the 13 week stop rule which means if his hepatitis C viral load is greater than 24,000 IU/mL at 13 weeks.  If it is less than 24,000 IU/mL but is still detectable recheck at 25 weeks and stop the treatment if it is detectable.

4.    Please do not omit the five week hepatitis C viral load by dDNA.

5.    He can return to see me in four to five months with a discussion of the 5 week/13 week viral load results.

(*Id.* at 138).

On December 20, 2007, plaintiff received his bottom bunk assignment.  (docket # 61 at 132).  On December 23, 2007, he sent a kite to health services regarding his pain medications.  Plaintiff wrote that Dr. Hutchinson had indicated that he should no longer take Motrin.  Plaintiff had been authorized to receive Motrin from November 20, 2007 through January 2, 2008.  On December 27, 2007, plaintiff was called out to health services and discussed his pain medications with James Barber, R.N. (Barber Aff. ¶ 5, docket # 59).  Nurse Barber found that there were no instructions to change plaintiff's medications.  It appeared to Nurse Barber that plaintiff was attempting to obtain restricted medications.  (Barber Aff. ¶¶ 4-5, docket # 59; docket # 61 at 127).

Nurse Helen Thompson is MTF's Health Unit Manager (HUM).  She does not typically engage in patient care and treatment of individual prisoners.  Her duties as HUM include

---

[5]Pegasys is a brand name of Interferon and Peginterferon Alpha 2-a is a generic equivalent. Ribasphere is a brand name and Ribavirin is its generic counterpart.  (docket # 61 at 116).

assisting in the overall planning direction and oversight of Health Care Services, including nursing, dental, physician, psychologist, and ancillary contractual services. She hires, teaches, directs, counsels, evaluates and disciplines registered nurses and other health care staff under her supervision. She approves leave, performs service ratings, counsels employees, and participates in employee grievance procedures and the hiring and training of personnel. (Thompson Aff. ¶ 3). She did not schedule plaintiff's appointments. (*Id.* at ¶ 5).

On January 2, 2008, P. A. LaNore noted that plaintiff was refusing the Motrin that he was provided for his knee discomfort. Plaintiff was advised to continue his range of motion exercises to alleviate discomfort and maintain flexibility. LaNore sent an e-mail to Dr. Hutchinson regarding his recommendations for appropriate pain medication, if any, for plaintiff's knee. (docket # 61 at 124). On January 6, 2008, plaintiff wrote a kite requesting Tylenol for his knee pain. On January 7, 2008, Nurse Griffin responded, stating that the matter (medication issue) would be referred to the medical service provider for a determination, because Nurse Griffin lacked authority to alter medications ordered by a physician. Dr. Hutchinson continued plaintiff's Motrin prescription. (Griffin Aff. ¶ 4, docket # 57; docket # 61 at 122).

On January 30, 2008, Nurse Griffin received a kite from plaintiff complaining that he was experiencing fatigue, stomach problems, pain and cramps. Plaintiff did not request an evaluation for these complaints. He stated that he had been approved for hepatitis treatment and wanted to know when the treatments would start. Nurse Griffin reviewed plaintiff's medical records and noted that he was scheduled to have his laboratory tests drawn the next day. Griffin advised plaintiff that it was anticipated that his treatment would start after his January 31, 2008 test results

were available.  (Griffin Aff. ¶¶ 5-7; docket # 61 at 120).  Plaintiff's test results did not preclude combination therapy.  (docket # 61 at 111-21, 333).

On February 1, 2008, plaintiff started combination therapy with Ribavirin and Interferon.  His 48-week treatment schedule would carry through the end of 2008.  (docket # 61 at 108-10, 116-118).  Throughout treatment, plaintiff received regular blood tests.  (*Id.* at 70, 72-73, 83, 85, 93, 328-32).

On February 8, 2008, P.A. LaNore examined plaintiff.  Plaintiff reported that he was a smoker and that he had smoked a pack of cigarettes per day for twenty-one years.  Plaintiff's blood pressure was 136/82.  He stated that his treatment injections were causing some aches and chills.  He was not experiencing side-effects from his oral medications.  Plaintiff stated that in the past he had tried naproxen and found that it relieved his headaches.  P.A. LaNore gave plaintiff the naproxen that he had requested and advised him that it was a non-steroidal anti-inflammatory drug (NSAID).[6] Plaintiff related that he had been instructed to avoid NSAIDs, but he wanted this naproxen prescription regardless of past recommendations.  Plaintiff's physical examination was entirely normal. (docket # 61 at 94-98).  On February 8, 2008, plaintiff filed this lawsuit.

On February 13, 2008, Psychologist David E. Snelling examined plaintiff.  Plaintiff reported that he had no feelings of depression and only a slight increase in irritability.  He was optimistic about his positive response to combination therapy.  Snelling noted that plaintiff's grooming was appropriate.  He maintained good eye contact and was positive in attitude and mood.

---

[6]"Naproxen is a nonsteroidal anti-inflammatory drug (NSAID)."  PHYSICIANS' DESK REFERENCE, 2632 (63rd ed. 2009).  Naprosyn is a brand name of naproxen tablets.  (*Id.*).

His speech was clear, coherent, and well modulated. Psychologist Snelling found that there were no signs or symptoms that combination therapy was causing mood alteration. (docket # 61 at 90).

On February 22, 2008, plaintiff reported to Physician's Assistant LaNore that he experienced some fatigue after Interferon treatment. Other than dry skin, plaintiff had no other complaints. Plaintiff's hepatitis C was asymptomatic. He was tolerating low dose NSAID medication, and plaintiff stated that he was only taking one pill per day to relieve his knee discomfort. Plaintiff's physical examination returned normal results. (docket # 61 at 79-85). Six days later, plaintiff submitted a kite to Nurse Boeve complaining that "Naprosyn is just as bad as Motrin." Plaintiff was scheduled for patient education. (*Id.* at 78).

On March 3, 2008, plaintiff requested that his NSAID prescription be discontinued because he believed that it was bad for his liver. He wanted a prescription for Ultram. (docket # 61 at 76). Nurse Griffin provided plaintiff with copies of pages from the Physician's Desk Reference for his review. Plaintiff's physical examination returned normal results. (docket # 61 at 76). Later that day, plaintiff gave the pages from the Physician's Desk Reference to defendant LaNore. Plaintiff stated that he had "stopped" taking NSAIDs on February 1, 2008. LaNore expressed his medical opinion that normal doses of NSAIDs were safe for plaintiff. Nonetheless, LaNore referred plaintiff's request to Dr. Nelson for a determination whether Ultram was a preferable prescription medication for plaintiff's condition. (*Id.* at 74).

On March 6, 2008, Nurse Griffin examined plaintiff in response to a health care request by plaintiff complaining that he was experiencing an itching sensation on his stomach after hepatitis C treatment. Nurse Griffin observed that plaintiff had some redness and mild soft tissue swelling, but there was no sign of any infection. Griffin contacted the medical care provider who

approved treatment with Zantac for its antihistamine effect. Plaintiff was instructed to contact health services if this treatment was not effective in relieving his symptoms. (docket # 61 at 69). Plaintiff persistently requested Ultram. On March 11, 2008, Nurse Boeve noted that plaintiff was refusing Naprosyn, Tylenol, and Motrin. He was using the Physician's Desk Reference and wanted "to make his own treatment" regimen. (*Id.* at 68).

On March 11, 2008, plaintiff filed the following health care request:

> I've received two different medications for my itching. Neither one has done anything to rectify my itching. I'm getting less than 3 hours a night [of] sleep. I'm very irritable due to the lack of sleep and itching. I don't know what to do to get proper treatment for this, as kites and talking to nurses has not done anything.

(docket # 7, attachment). Nurse Barber responded to this health care request on March 12, 2008. He stated, "You were seen by [a] nurse the other day and this was discussed. You are see [sic] by MP and nurse. If you are having bad side-effects from medication we might need to discontinue treatment. No order for change in medication." (docket # 7, attachment; docket # 61 at 67).

On March 12, 2008, Psychologist Snelling examined plaintiff. Plaintiff stated that part of his problem with irritability and difficulty sleeping was his "lock location in the front hallway across from the dayroom." He complained that there was too much light at night and that there was a good deal of prisoner traffic during the day. The psychologist indicated that he would forward a note suggesting a possible cell assignment change. (docket # 61 at 66). Defendant LaNore examined plaintiff on March 2, 2008. Plaintiff reported that he was tolerating combination therapy, but he was still experiencing an itching sensation. Plaintiff reported that hydrocortisone cream provided some relief. Zantac was ineffective. LaNore stated that plaintiff would continue to receive his weekly Ribavirin and Interferon treatment. He discontinued plaintiff's prescription for Zantac

and replaced it with Benadryl. (*Id.* at 2, 54-64). Plaintiff filed his amended complaint on March 24, 2008. Plaintiff's medical records reveal that he continued to receive extensive medical treatment. (docket # 61 at 2-93, 328-30; docket # 69, Ex. G).

### C.     Plaintiff's Grievances

1.     <u>Grievance Number MTF-06-09-708-12D</u>

On September 27, 2006, plaintiff filed Grievance Number MTF-06-09-708-12D against Corrections Medical Services (CMS). He identified the "date of the incident" as 9-27-06 and complained that CMS had not supplied him with medical information when he requested it:

> On several attempts for information concerning treatment, both application and diagnostic procedure's [sic] (criteria), proper diet recommendations, [l]iver biopsy, and acceptable medications allowed for a patient with my progressive disease. C.M.S. on three attempts eluded patient[']s medical information requests, which is my right being a chronic care patient. [H]ow can I protect myself from departmental corruption or for preservation of continued health care if C.M.S. is allowed to apply themselves [sic] in any manner they [sic] see appropriate for the situation that is present[?] It makes time limits for grievance procedures impossible, and places my welfare in a dangerous predicament, where otherwise I've been given treatment.

> 1.     [A]sking for their criteria recommendations on hepatitis C, before they apply treatment[;]
> 2.     [P]roper diet recommendations[;]
> 3.     Information on medications I can and can't take[;]
> 4.     Liver biopsy[; and]
> 5.     TREATMENT.

(docket # 119, Ex. A; Attachments 3, 4; docket # 121, Plf. Aff. ¶ 1; docket # 11, Ex. 1). Nurse Supervisor A. Aquino provided the Step I grievance response:

> Grievant was seen on 10/4/06 concerning his grievance. Review of chart indicates that grievant was seen by the Medical Services Provider on 9/27/06[.] [A] CHJ-630, Hep C Counseling Form was completed along with a discussion of Hep C treatment. Today grievant [was] provided with a number of copies of material pertaining to Hep C during this grievance review for educational purposes: How to Stop Smoking; How to eat Healthy; You

can eat and have your cake too; Hep C; Walking exercising; What is Hep C; [and] Healthy Heart. Grievant [was] also informed that he may kite the dietician for counseling on what foods to eat. Encouraged grievant to stop smoking and be pro-active [sic] in his health maintenance. Grievant [was] asked to sign off[.] [G]rievant refus[ed and] state[ed that he is] not signing off until [he] get[s] treatment. Health Services has provided health care per PD 03.04.100 Health Service.

(docket # 119, Ex. A, Attachment 4).

Plaintiff pursued an appeal to Step II. Julie Van Setters was the author of this Step II response:

The Step I grievance/ response and Step II appeal have been reviewed. The grievant is being properly wor[k]ed up for his disease. The medical service provider (MSP) is following the monitoring and workup sheet. The grievant has been provided education on smoking cessation, eating healthy, exercise and Hepatitis C. He is encouraged to discuss specific treatment questions with MSP at his CCC appointments. He has been advised he may kite the dietician for further diet discussion though generally a healthy diet as previously given is appropriate. Grievance denied.

(*Id.*). Plaintiff pursued a Step III appeal and received this response:

The information presented on appeal to step III has been reviewed in addition to the medical record. The [S]tep I and Step II responses appropriately addressed the grievance. Grievant's condition has been monitored, evaluated, regular diagnostic testing conducted and treatment rendered when deemed medically necessary.

Grievance denied.

(*Id.*).

2.    Grievance No. MTF-07-11-699-28B

On November 1, 2007, plaintiff filed Grievance No. MTF-07-11-699-28B. (Plf. Aff. ¶ 4, docket # 121). In the space provided for plaintiff to explain his attempts to resolve the issue prior to writing the grievance, plaintiff stated that in the "month of October" he "wrote health care request form[s] over and over again with no response [with] 4 attempts." He identified the "date of

the incident" as "October," without specifying the year. His grievance did not include the names of

any individuals, nor the nature of his "health problems." He stated, in generic fashion, as follows:

> I've been having problems with my health and when I write Health Care they do <u>Nothing</u>. Health Care does not respond back to me at all. I feel this shows dereliction of duties and deliberate indifference to my health care needs.

(docket # 119, Ex. A, Attachment 5). On November 6, 2007, the grievance was rejected at Step I

by the grievance coordinator because plaintiff had not complied with the requirements of Policy

Directive 03.02.130:

> In order to submit a grievance in a responsible manner you must minimally indicate **who** you are grieving, **what** they did and **how** it violated **what** policy. You did not cite what staff violated what policies[,] *i.e.* [n]othing was stated regarding any particular problem with health care[.] [Y]ou must at least state the PROBLEM. The grievance is rejected at this level according to the provisions of PD-03.02.130, Prisoner/Parolee Grievances.
>
> **GRIEVANCE REJECTED PER PD-03.02.130 ---- VAGUE at best.**

(docket # 119, Ex. A, Attachment 5).

> Plaintiff's statement of his reasons for pursuing a Step II appeal is quoted below:

In October[7] I sent 4 Health Care Forms (CHJ-549) and no one responded. Helen Thompson, R.U.M, as part of her duty did not monitor her workers who failed to answer any of the kites sent. According to Policy 03.04.100 on pg. 6, paragraph HH, subsection 2, number 2, gives the protocol for being called out[,] which by not answering the Health Care Request violates her own policy. I can't name anyone else as they never responded. "See Attached Exhibits."

(*Id.*). Plaintiff did not receive a Step II response. He gave the following reasons for his Step III

appeal:

---

[7]None of the health care requests plaintiff has filed with the court are dated October 2007, as would be expected for a November 2007 grievance. He did file four health care requests in October 2006, and presumably his October 4, 6, 11, and 14, 2006 health care requests were the ones that he attached as exhibits to his Step II appeal. None of these requests were directed to defendants Hutchinson, Nelson, or LaNore. (docket # 1, Ex. 5; docket # 11, Ex. 4).

That after waiting for six weeks I still have not received a response at Step two, so I'm moving to step three[,] [a]s per policy 03[.]02[.]130[.] I'm asking for a declaratory judgment of $75,000 plus medical bills related to damage to my liver by these delays from medical and from the administration. This refusal again goes to the act of deliberate indifference and dereliction of duty.

(*Id.*).

The Step III response is dated April 30, 2008. With the additional information plaintiff supplied in the Step II appeal, specifically defendant Thompson's name and a claim that plaintiff had not received a response to four health care forms that he submitted in "October," the Step III grievance respondent indulgently found that the "main issue" plaintiff had raised in this grievance was the lack of a response to his October health care requests:

The grievant presents an issue which he alleges that he sent kites to health care for health problems but had not received a response. Grievant does not specify any request as relief [sic] for filing this grievance. The grievance was processed and rejected at the local level in accordance with the provisions of Policy Directive and Operation [sic] Procedure 03.02.130 (Prisoner/Parole[e] Grievances).

The Step I respondent found that Grievant's issue was vague and rejected [it] per PD 03.02.130. Step II respondent did not send Grievant a response within the time limits written in PD 03.02.130, and did appeal directly to Step III. [sic]. Grievant at Step III reiterates his complaint and adds a [demand for a] declaratory judgment for $75,000.00.

This investigator reviewed the record presented with the appeal to step three. All relevant information was considered. Based on this review, this writer finds that staff did not properly respond to the grievance and did not address the merits of the main issue grieved. Grievant stated he kited health care (4) four times without a response. This is not a vague issue. Grievant was seen by Health Care on 10-5-07, 10-8-07, 10-17-07, 10-25-07. Grievant presented inadequate evidence to confirm any violation of PD 03.03.130. No additional information was provided to negate the step I and II responses.

This grievance appeal is denied.

(docket # 119, Ex. A, Attachment 5).

<u>**Discussion**</u>

I.  **Claims Against Defendants Barber, Boeve, Griffin, and Thompson**

    A.    <u>Eleventh Amendment Immunity</u>

All plaintiff's claims for damages against defendants Barber, Boeve, Griffin, and Thompson in their official capacities are barred by Eleventh Amendment immunity. The Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir.1986). A suit against a state officer in his or her official capacity is simply another way of pleading an action against the state. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's claims for monetary damages against them in their official capacities.

    B.    <u>Eighth Amendment Claims</u>

Plaintiff alleges that defendants Barber, Boeve, Griffin, and Thompson were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights under the Cruel and Unusual Punishments Clause. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested

by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104-05. In judging the sufficiency of "deliberate indifference" claims, the court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention. *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified the deliberate indifference standard. Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (an objective component) and that the state official acted with a sufficiently culpable state of mind (a subjective component). 501 U.S. at 298. No reasonable trier of fact could find in plaintiff's favor against these four defendants on either component of is Eighth Amendment claims.

The objective component of the Eighth Amendment standard requires that a plaintiff be suffering from a serious medical condition. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[D]elay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a constitutional violation." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2005). "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* A non-obvious need for medical care can satisfy the "serious" medical need requirement, but "the inmate must place verifying medical evidence in the record to

establish the detrimental effect of the delay in medical treatment." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005); *see Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001). The mere presence of a serious medical condition is insufficient to establish the objective component. The plaintiff must make "an 'objective' showing that the deprivation was 'sufficiently serious' or that the result of the defendant's denial was sufficiently serious." *Hudson*, 508 U.S. at 8; *see Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

Plaintiff falls far short of presenting evidence on which a reasonable trier of fact could find in his favor on the objective component. He has not presented evidence that Nurses Barber, Boeve, Griffin, or Thompson caused any objectively serious deprivation. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006). Plaintiff presented no medical evidence that his liver suffered any damage as a result of any action or inaction by these four nurse defendants. It is pellucid that upon being diagnosed with hepatitis C, plaintiff would have preferred to immediately proceed to a surgical biopsy followed by combination therapy with Interferon and Ribavirin. The record is replete with medical evidence that it was appropriate to proceed with a logical pattern of testing before resorting to an invasive surgical procedure followed by treatment with medications known to have serious side-effects. These four nurse defendants were not responsible for prescribing plaintiff's medications, nor for approving his biopsy and combination therapy. Nurse Barber never "threatened" to discontinue plaintiff's hepatitis C treatment. Barber simply noted the unremarkable fact that if the side-effects from treatment became too severe, it might become medically necessary to terminate plaintiff's Interferon and Ribavirin treatment. No reasonable trier of fact could find in plaintiff's favor on the objective component of his Eighth Amendment claims against defendants.

The second prong under *Estelle* requires a showing of "deliberate indifference" to plaintiff's serious medical need. The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994), that deliberate indifference is tantamount to a finding of criminal recklessness. A prison official cannot be found liable for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety." 511 U.S. at 837. The Sixth Circuit's decision in *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), summarized the subjective component's requirements:

> The subjective component, by contrast, requires a showing that the prison official possessed a sufficiently culpable state of mind in denying medical care. Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. The prison official's state of mind must evince deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference. Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller*, 408 F.3d at 813 (citations and quotations omitted); *see Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) ("The subjective standard is meant to prevent the constitutionalization of medical malpractice claims . . . ."); *accord Mabry v. Antonini*, 289 F. App'x 895, 903 (6th Cir. 2008) ("'Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law.'") (quoting *Westlake*, 537 F.2d 860 n.5). Plaintiff's disagreement with the medical treatment these nurses provided under the direction of plaintiff's treating physicians and a physician's assistant falls far short of supporting Eighth Amendment claims. *See e.g.*, *Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 357 (6th Cir. 2006); *Kirkham v. Wilkinson*, 101 F. App'x 628, 630 (6th Cir. 2004). No reasonable trier of fact

could find in plaintiff's favor on the subjective component of his Eighth Amendment claims against defendants Barber, Boeve, Griffin, and Thompson. These four defendants are entitled to entry of judgment in their favor as a matter of law.

C.     Qualified Immunity

Alternatively, I find that defendants Barber, Boeve, Griffin, and Thompson are entitled to entry of judgment in their favor on plaintiff's claims for damages against them in their individual capacities on the basis of qualified immunity. "The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *See Everson v.* Leis, 556 F.3d 484, 494 (6th Cir. 2009); *Hayes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009). The question whether qualified immunity attaches to an official's actions is a purely legal issue for the court. *See Everson*, 556 F.3d at 494; *Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), endorsed a two-prong analysis for addressing qualified immunity issues. The first prong is whether

the plaintiff has alleged and supported with evidence[8] facts showing that the defendant's conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 550 U.S. 372, 376 (2007); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). The second prong of the qualified immunity inquiry is whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201. Judges are permitted to exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009); *see Waeschle v. Dragovic*, 576 F.3d 539, 543-44 (6th Cir. 2009). Here, I find that the sequence endorsed by the Court in *Saucier* is appropriate, and that plaintiff fails to satisfy the first prong of the qualified immunity analysis for the reasons previously stated herein.

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement under *Saucier*, he would nonetheless fall short of showing that each right plaintiff claims a defendant violated was "clearly established" such that a reasonable official in the defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right. 533 U.S. at 201. "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct. at 822.

_____

[8]A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004); *see Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009).

The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir. 2006). "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'" *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Nadar v. Blackwell*, 545 F.3d 459, 473 (6th Cir. 2008) ("[Q]ualified immunity applies unless *any officer* in the defendant's position would have clearly understood that he was under an affirmative duty to have refrained from such conduct."). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201). Although it is not always necessary to find a case

where identical conduct had previously been determined to be unconstitutional,[9] in light of preexisting law, the unlawfulness must be apparent. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). If judges are in disagreement on an issue at the time the defendant acted, it is "unfair" to later subject the defendant to monetary damages "for picking the losing side in the controversy." *Pearson*, 129 S. Ct. at 823. "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary." *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005). The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)). "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-

---

[9]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199.

situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964. "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427.

Plaintiff's argument that defendants are not entitled to qualified immunity because the Supreme Court's decision in *Estelle v. Gamble* clearly established his Eighth Amendment rights against intentional interference with treatment or intentional denial or delay of access to medical care (Plf. Brief at 36-42) does not suffice. The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Brosseau v. Haugen*, 543 U.S. at 198. Plaintiff has not presented the court with a single case where a federal court has held that nurses are constitutionally required to second-guess and somehow overrule the opinions of treating physicians regarding when a surgical biopsy should be performed and when combination therapy should be implemented for treatment of a prisoner's hepatitis C. The Sixth Circuit and other federal courts have recognized that claims like plaintiff's do not rise to the level of a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause. *See e.g.*, *Dodson v. Wilkinson*, 304 F. App'x 434, (6th Cir. 2008) ("Dodson's disagreement with the testing and treatment he has received since being diagnosed with Hepatitis C does not rise to the level of an Eight Amendment violation."); *see also Hines v. Anderson*, 547 F.3d 915 (8th Cir. 2008); *Henry v. Maue*, No. 2:06cv1439, 2008 WL 5188834, at * 5-6 (W.D. Pa. Dec. 10, 2008). I find that defendants Barber, Boeve, Griffin, and Thompson are entitled to judgment in their favor on plaintiff's claims for monetary damages against them in their individual capacities on the alternative basis of qualified immunity.

## II.     Claims Against Defendants Hutchinson, Nelson, and LaNore

Defendants Hutchinson, Nelson, and LaNore seek dismissal of plaintiff's claims against them on the ground that plaintiff did not exhaust his available administrative remedies, as required by 42 U.S.C. § 1997e(a).  Upon review, I find that plaintiff did not exhaust his administrative remedies on his claims against these defendants.  I recommend that defendants' motion for summary judgment be granted and that plaintiff's claims against defendants Hutchinson, Nelson, and LaNore be dismissed without prejudice under 42 U.S.C. § 1997e(a).

"Congress enacted the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e *et seq.* in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts.  The PLRA contains a variety of provisions designed to bring this litigation under control . . . .  A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision, § 1997e(a)."  *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).  "The PLRA attempts to eliminate unwarranted federal interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing initiation of a federal case."  *Id.* at 93.  It attempts to reduce the quantity and improve the quality of prisoner suits.  *Id.* at 94.  Requiring proper exhaustion serves all of these goals:

> Requiring proper exhaustion serves all of these goals.  It gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors.  This is particularly important in relation to state corrections systems because it is "difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-492, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

Proper exhaustion reduces the quantity of prisoner suits because some prisoners are successful in the administrative process, and others are persuaded by the proceedings not to file an action in federal court. Finally, proper exhaustion improves the quality of those prisoner suits that are eventually filed because proper exhaustion often results in the creation of an administrative record that is helpful to the court. When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved.

*Woodford*, 548 U.S. at 94-95.

"The exhaustion provision of the PLRA states: 'No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.'" *Jones v. Bock*, 549 U.S. 199, 204 (2007) (quoting 42 U.S.C. § 1997e(a)). Exhaustion is mandatory. *Woodford*, 548 U.S. at 85 (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "[N]o unexhausted claim may be considered." *Jones v. Bock*, 549 U.S. at 220. In order for a claim to be exhausted, it must be fairly presented to prison officials through the grievance process. *Woodford*, 548 U.S. at 94. In addition, the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. at 218. At all times relevant to plaintiff's complaint, the MDOC has required a great deal of specificity. Under Policy Directive No. 03.02.130, plaintiff was "explicitly required to name each person against whom he grieved." *Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009). His grievances were required to provide "the facts involving the issue being

grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be provided." Policy Directive 03.02.130; *see Vandiver v. Correctional Med. Services*, 326 F. App'x 885, 888 (6th Cir. 2009). Applying these standards, it is patent that plaintiff did not exhaust his available administrative remedies on the claims he is now asserting against defendants Hutchinson, Nelson, and LaNore.

Plaintiff's Grievance Number MTF-06-09-708-12D was against CMS. It did not exhaust plaintiff's claims against defendants. Grievance Number MTF-07-11-699-28B was not a grievance against defendants Hutchinson, Nelson, and LaNore. It was plaintiff's grievance that he had not received defendant Thompson's response to four health care request forms he submitted in "October" of 2006 or 2007. Defendants Hutchinson, Nelson, and LaNore are entitled to dismissal of plaintiff's claims under 42 U.S.C. § 1997e(a).

The only remaining question is whether the dismissal should be with or without prejudice. Generally, the dismissal of claims for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a) is without prejudice. *See Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006). Defendants Hutchinson, Nelson, and LaNore have not presented any developed argument why dismissal "with prejudice" (docket # 119 at 3, docket # 91 at 3, docket # 93 at 21) would be appropriate.[10] This would ordinarily end the inquiry, and the recommendation would be

---

[10]It is virtually certain that any grievance plaintiff might now file against these three defendants regarding the medical treatment he received during the period August 2006 through March 24, 2008, would be rejected as untimely at Step I, and upheld on that basis at Steps II and III. A grievance so rejected would provide a basis for dismissing plaintiff's claims with prejudice because "proper exhaustion still requires compliance with the grievance policy's critical procedures such as timeliness." *Vandiver*, 326 F. App'x at 889 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) and *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir.2002) (stating that dismissal for failure to exhaust is without prejudice and does not bar the reinstatement of the suit, unless it is too

for a dismissal without prejudice.  Here, however, plaintiff has repeatedly lied to the court concerning the exhaustion issue, and the court must at least consider the harsh sanction of dismissal with prejudice.  Plaintiff's statements that he "did not know the names of those involved in his medical care" (Plf. Brief at 5, docket # 120) and that he was being "prevent[ed] from learning the names of those involved" (Sur-reply Brief at 1, docket # 123), are patently false.  His own exhibits (*see e.g.*, docket # 104, Exhibits 4, 7, 9; docket # 69, Exhibits B, C, D; docket # 11, Ex. 4) show that plaintiff knew the names of defendants Hutchinson, Nelson, and LaNore and their roles in providing his medical care.  The court cannot tolerate such abuses.  Plaintiff is expressly warned that any similar offense in the future will be met with harsh sanctions, including dismissal of his claims with prejudice.  Here, I recommend a lesser sanction.  The order dismissing plaintiff's claims under 42 U.S.C. § 1997e(a) should include an injunction requiring that any lawsuit plaintiff files in this court naming Hutchinson, Nelson, or LaNore as a defendant must include the name of this case and its case number.  This relatively minor sanction will assist the court in monitoring plaintiff's compliance with the requirements of the PLRA and avoid the waste of judicial resources.  Plaintiff's failure to comply with the injunction would result in the dismissal of his lawsuit with prejudice.

---

late to exhaust)).  However, a decision based on events that have already occurred is on a stronger foundation than one anticipating future events.   Plaintiff could easily decide that, at this juncture, he is so unlikely to prevail on his claims against defendants Hutchinson, Nelson, and LaNore that attempting to exhaust these claims through the grievance process and filing a new lawsuit are simply not worth the effort and expense involved.  Furthermore, the law under section 1997e(a) regarding how district courts should handle "anticipated procedural defaults" by prisoners is not well developed.  Undoubtedly considerations of judicial economy and preservation of scarce judicial resources fit somewhere within the analytical framework, but exactly where remains unclear.

## Recommended Disposition

For the reasons set forth herein, I recommend that all plaintiff's claims against defendant Judy Irish be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure. I further recommend that the motion for summary judgment by defendants Hutchinson, Nelson, and LaNore (docket # 91) be granted, that all plaintiff's claims against these defendants be dismissed without prejudice under 42 U.S.C. § 1997e(a), and that the court enter an injunction against plaintiff requiring that any lawsuit he files in this court naming Hutchinson, Nelson, or LaNore as a defendant must include the name of this case and its case number. I further recommend that the motion for summary judgment by defendants Barber, Boeve, Griffin, and Thompson (docket # 50) be granted. An order implementing these recommendations should be entered. I further recommend that a separate and final judgment be entered in favor of defendants Barber, Boeve, Griffin, and Thompson on all plaintiff's claims.


Dated:   October 9, 2009          /s/  Joseph G. Scoville
                                  United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).